UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BENITA THOMAS, individually and d/b/a CONTRACT PROJECT MANAGEMENT ENTERPRISES (CpMe); CPME, INC.; and NPRO, Inc., <br><br>            Plaintiffs, <br><br>       v. <br><br>KJM & ASSOCIATES, LTD., <br><br>            Defendant. | CASE NO. C04-1756M <br><br> ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Dkt. #29). Defendant seeks dismissal of all of plaintiffs' claims. For the reasons set forth below, the Court GRANTS defendant's motion.

## II. DISCUSSION

**A. Background**

Plaintiffs are Benita Thomas, an African American woman, individually, and d/b/a Contract Project Management Enterprises, CpMe, Inc., and nPRO, Inc., ("CpMe" collectively). Plaintiffs bring claims of discrimination under 42 U.S.C. § 1981, breach of contract, retaliation, and misrepresentation

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 1

against KJM & Associates, Ltd ("KJM"). Originally brought in state court, this action was subsequently removed to this Court on August 10, 2004.

Plaintiffs and defendant joined together by way of a Teaming Agreement in 1998 with the purpose of gaining a contract – KJM as prime contractor, CpMe as subcontractor – with Central Puget Sound Regional Transit Authority (Sound Transit) to provide Management Systems and Project Control Support. Sound Transit's request for proposals placed an emphasis on the use of minority or women-owned disadvantaged business enterprises ("DBEs"). Both KJM and CpMe are certified DBEs. KJM was awarded the contract by Sound Transit and subsequently entered into a subcontract with CpMe. At the time, CpMe was a sole proprietorship.

In 2001, Ms. Thomas hired a single employee, Gerald Bradford, as Diversity Analyst. Mr. Bradford worked on-site at Sound Transit under KJM's project manager, Cheryl Davidowicz. The two had a poor working relationship that deteriorated over the course of Mr. Bradford's employment, and culminated in Mr. Bradford's refusal to speak with or take direction from Ms. Davidowicz. On October 2, 2002, KJM released Mr. Bradford from his duties on the Sound Transit contract citing, among other reasons, insubordination.

Also effective October 2, 2002, KJM terminated CpMe's subcontract pursuant to Section 12, calling it a "termination for convenience." Although the subcontract stated that compensation was not to exceed $305,545.00, by the time of termination plaintiffs had been paid $775,361.53.

**B. Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *See F.D.I.C. v. O'Melveny & Meyers*, 969

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 2
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 2

F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,* 512 U.S. 79 (1994). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 257. Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment. *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Material facts are those which might affect the outcome of the suit under governing law. *See id.* In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

### C. Discrimination: Contract Termination

Plaintiffs claim injury under 42 U.S.C. § 1981 and RCW 49.60 due to termination of the subcontract in a "racially discriminatory and hostile manner." (Dkt. #48 at 23). Claims under § 1981 and RCW 49.60 follow the *McDonnell Douglas* burden-shifting analysis. *See Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840 (9th Cir. 2004); *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180 (2001). Plaintiffs must first establish a prima facie case of discrimination. *Hill*, 144 Wn.2d at 181. In particular, they must show that 1) they belong to a protected class; 2) they were performing according to KJM's legitimate expectations; 3) they suffered an adverse contractual action; and 4) similarly situated individuals outside the protected class were treated more favorably. *See Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) (applying the formula specifically to an independent contractor situation).

Plaintiffs fail to identify or argue these elements. More importantly, plaintiffs do not allege facts sufficient to show that they were performing up to reasonable expectations or that similarly

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 3

situated members outside the protected class were treated more favorably. In fact, much of the record is filled with evidence that CpMe's sole employee, Mr. Bradford, was performing well below expectations, and personnel at Sound Transit were dissatisfied with the quality of his work. (*See, e.g.*, Dkt. #32, ¶ 4-13, Ex. A). Additionally, the record shows no instances of similarly situated individuals outside the protected class receiving different treatment. Because plaintiffs' *prima facie* case fails, there is no need to address KJM's legitimate, non-discriminatory explanation for terminating the contract or whether there is evidence to show such reason is a pretext for discrimination.[1] Accordingly, the Court dismisses plaintiffs' contract termination discrimination claim for failure to establish a prima facie case.

### D. Discrimination: Fronting and DBE Fraud

Plaintiffs next claim injury under 42 U.S.C. § 1981 and RCW 49.60 alleging discrimination through "Fronting" and "DBE Fraud." The essence of the claim is that KJM used the minority status of CpMe to gain the contract with Sound Transit, promising CpMe the contract administration lead position, diversity tracking work, and two additional positions. (Dkt. #48 at 21). Once having gained the contract, KJM allegedly marginalized CpMe's role by refusing to assign the promised "distinct [and] meaningful work." *Id.* Plaintiffs refer to this as a sophisticated form of "bait and switch."[2] *Id.*

---

[1] However, plaintiffs appear to try to show pretext by claiming KJM gave contradictory reasons for terminating the contract citing first "insubordination" and then "convenience." These are not actually contradictory. While Mr. Bradford's insubordination led to the decision to terminate, termination under § 12 of the subcontract must be "for convenience" or "for default." "Termination for convenience" is allowed any time KJM deems such termination is in the best interest of KJM and Sound Transit. (Dkt. #52-3, Ex. 5 at 68). Terminating CpMe's contract because of Mr. Bradford's insubordination appears to be consistent with the best interests of KJM.

[2] The parties also quarrel over whether this can be called "fronting" or if such term only applies when a company purports to be a DBE but is not. *See Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1305 (9th Cir. 1992) (describing "fronts," "conduits," and "pass-throughs" in the context of DBE subcontracting). To avoid confusion, the Court will refer to this allegation as the "bait and switch" claim.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 4

Defendant states that "plaintiffs attempt to fashion a new type of discrimination claim," calling it "nonsense" and a "brazen creation of broad 'per se' rights for DBE contractors." (Dkt. #53 at 12). While there appear to be no similar Ninth Circuit cases, these facts closely parallel those at issue in *Edwards & Assoc., Inc., v. Black & Veatch, L.L.P.*, 84 F. Supp. 2d 1182 (D. Kan. 2000). Noting both parties' failure to cite to any other analogous cases,[3] the Court finds *Edwards* persuasive and will use it as a basis for its analysis.

*Edwards* involved a prime contractor and subcontractor who had coordinated their efforts to secure a government contract. 84 F. Supp. 2d at 1185. The plaintiffs were a minority business enterprise and its owner who alleged that the defendant prime contractor refused to allow plaintiffs to participate meaningfully in the project after securing the contract. *Id.* Specifically, the plaintiffs claimed that the defendant "reduced plaintiffs participation in the [] project on the basis of [plaintiff's] race in violation of section 1981 . . . ." *Id.* at 1191. The court analyzed the claim under the burden shifting framework of *McDonnell Douglas*. *Id.*

The *Edwards* court offered two versions of the elements necessary to establish a *prima facie* case, stating that "[p]resumably, both tests are correct and the application of one test over the other would depend on the particular factual context of a given case." *Id.* at 1192 n.17. First, a plaintiff can establish a *prima facie* case by showing 1) he is a member of a racial minority; 2) the defendant had an intent to discriminate on the basis of race; and 3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract). *Id.* Alternatively, a

---

[3]Defendant cites to *Imagineering,* 976 F.2d 1303, for the proposition that "allegations touching upon race in the 'fronting' context fail to state a cause of action under section 1981." (Dkt. #29 at 22). However, *Imagineering* addressed whether the plaintiffs – subcontractors with agreements with "innocent" prime contractors – had standing to sue defendants for allegedly gaining the prime contracts by fraudulently claiming to comply with the DBE requirements. 976 F.2d at 1313. Plaintiffs had no standing because it was uncertain what contract the defendant prevented the plaintiffs from entering into. *Id.* Plaintiffs in that case did *not* claim to have been used by the prime contractor to gain the contract and then refused the work they were promised.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 5

plaintiff could make a four-prong showing: 1) he is a member of a protected class; 2) he attempted to contract for certain services; 3) he was denied the right to contract for those services; and 4) such services remained available to others outside the protected class. *Id.* There is little support in the Ninth Circuit for the four-prong test.

A successful § 1981 claim requires proof of intentional discrimination. *General Bldg. Contractors Ass'n. v. Pa.*, 458 U.S. 375, 391 (1982). The first test set out above includes intent in the *prima facie* case, while the second allows the plaintiff to demonstrate intent indirectly through the burden-shifting analysis. Because the first test includes all the elements necessary to show a § 1981 violation, essentially rolling all the *McDonnell Douglas* requirements into the *prima facie* showing, the second test is more appropriate as the first step in the *McDonnell Douglas* formula. This Court does not decide, however, which test should be adopted because plaintiffs' case fails under either one.

Under the three-prong test above, plaintiffs fail to establish a *prima facie* case because they can point to no direct evidence of an intent to discriminate based on race.[4] Plaintiffs claim they were denied distinct and meaningful work because of race. (Dkt. #48 at 21). However, even if plaintiffs could show that they were included in the bid for the prime contract because of their DBE status, that still would not lead to the conclusion that they were then denied the work because of their minority status. While it is plausible that a prime contractor would employ such a tactic in violation of § 1981,

---

[4]Defendant has submitted a letter of complaint from Mr. Bradford to the EEOC in which he claims Ms. Davidowicz told KJM employee Nina Marquis that Mr. Bradford "was a lazy 'colored' who was trying to get over on corporate America." (Dkt. #31, Ex. J). This claim is hearsay and may not be considered for purposes of summary judgment. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980). Notably, plaintiffs offer no declarations or depositions alleging firsthand knowledge of such comments. Also worth noting, the EEOC's response was that "[t]here is no evidence that your race (black) or you were retaliated against for complaining about discrimination." (Dkt. #31, Ex. K).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 6

some showing of discriminatory intent must be demonstrated.[5]

Under the four-prong test, plaintiffs can establish membership in a protected class. Using Exhibit A to the Teaming Agreement, plaintiffs can also establish that they attempted to contract for the Contract Administration Lead position. (*See* Dkt. #52-2, Ex. 4 at 55.) Additionally, the subcontract shows that plaintiffs were not awarded such position. (*See* Dkt. #52-3, Ex. 5 at 82). There is no evidence to show, however, that the position remained open for others, whether outside the protected class or not. Plaintiffs claim that the prime contract's incorporation of KJM's proposal, listing plaintiffs as Contract Administration Lead, is proof that KJM did have that position to offer. This argument fails for the same reason plaintiffs' third-party beneficiary contract argument fails, namely, the incorporation language shows the intent of the parties to maintain a certain level of DBE participation, not to create a contractual right in each named subcontractor to perform a specific job. *See* discussion on Third-Party Contract Claim *supra*. Therefore, this cannot be used to show that KJM had the Contract Administration Lead position to offer to plaintiffs. Further, the record shows that Sound Transit did not make such a position available to KJM or its subcontractors. (Dkt. #46, ¶ 5).

Plaintiffs also rely on being promised and denied diversity tracking work and two additional employees as well as being removed from the Diversity Manager role. (Dkt. #48 at 21-22). Again, there is no evidence to show that any of these opportunities were made available to others outside the protected class. Diversity tracking was transferred to Tanya Jimale, an African American woman, and KJM employees, whose races are not given. (*See* Dkt. #51, ¶ 14). The issue of the two additional employees plaintiffs claim to have been denied stems from the Development Opportunity Plan

---

[5] Here, the record shows that KJM did not need CpMe's DBE status to gain the contract, further weakening any inference that race was a motivating factor in reducing CpMe's role. (*See* Dkt. #41, ¶ 4; Dkt. #52-1, Ex. B at 20 (Mask Depo. 25:10-21); Dkt. #52-5, Ex 68 at 146 ("No minimum level of DBE participation has been established for the purposes of this solicitation.")).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 7

incorporated into the subcontract at Attachment E.  Plaintiffs offer no evidence that other subcontractors were assigned additional employees that should have gone to CpMe.  Finally, Ms. Thomas was removed as Team Diversity Manager.  The record shows she was replaced by KJM employee Michelle Bauers.  (Dkt. #52-4, Ex. 13).  Plaintiffs make no allegations as to Ms. Bauers' ethnicity; therefore, the *prima facie* case fails and there is no need to look at whether KJM's proffered reasons for removing Ms. Thomas from that position are pretextual.

Having failed to establish a *prima facie* case under either test suggested in *Edwards*, plaintiffs' "bait and switch" claim under 42 U.S.C. § 1981 is dismissed.  Because the § 1981 contract termination claim also failed, all the federal claims have fallen out of the picture.

**E.  The Court's Jurisdiction Over State Law Claims**

A federal court has the discretion to retain jurisdiction over state law claims even after the federal claims have been dismissed.  *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991).  The decision is to be based on factors of "economy, convenience, fairness, and comity."  *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988)).  Because this action was removed to this Court over a year ago and we have been fully briefed on the issues, economy and convenience lean toward retaining jurisdiction.  Additionally, as mentioned above, failure of plaintiffs' third-party beneficiary contract claim relates partly to why the § 1981 "bait and switch" claim fails.

1. Misrepresentation and Retaliation

Plaintiffs have withdrawn their Misrepresentation and Retaliation causes of action.  (Dkt. #48 at 15, n.2).  Accordingly, the Court need not address these claims.

2. Breach of Contract:  Third Party Beneficiary to KJM/Sound Transit Contract

Plaintiffs allege that KJM breached its contract with Sound Transit harming Ms. Thomas as a third party beneficiary to the contract.  Ms. Thomas is not a third party beneficiary to the prime contract between KJM and Sound Transit.  A third party beneficiary contract is created when "the

parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract." *Del Guzzi Constr. Co., Inc., v. Global Northwest Ltd., Inc.*, 105 Wn.2d 878, 886 (1986). The required intent is described as follows: "If the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person." *Id.* (citing *Vikingstad v. Baggott*, 46 Wn.2d 494 (1955). Here, plaintiffs have failed to show such intent.

In *Del Guzzi*, a subcontractor was not allowed to sue as a third party beneficiary on the prime contract even though the project required minority participation and the subcontractor was a minority firm. 105 Wn.2d at 887. Plaintiffs distinguish *Del Guzzi* by noting that the subcontractor in that case was not named in the prime contract and arguing that plaintiffs were named in KJM's proposal to Sound Transit and that the proposal was incorporated into the prime contract by virtue of section 15. (Dkt. #48 at 16). Specifically, plaintiffs refer to section 15c which states that KJM "shall comply with all commitments made in [its] proposal . . . for the participation by such minority, women and disadvantaged businesses, which commitments are hereby incorporated herein by this reference." *Id.* Plaintiffs argue that because Benita Thomas was named as Contract Administration Lead in KJM's proposal, and the proposal was incorporated into the contract, that the parties intended to confer a benefit on plaintiffs, and therefore, they are a third party beneficiary. Further, plaintiffs argue that because Ms. Thomas was awarded a scope of work other than Contract Administration Lead, KJM is in breach of that contract.

While plaintiffs make a compelling argument, the "contracting parties' intent is determined by construing the terms of the contract as a whole, in light of the circumstances under which it is made." *Postlewait Constr., Inc., v. Great Am. Ins. Cos.*, 106 Wn.2d 96, 99-100 (1986). Section 15c continues on to state that KJM

> shall utilize M/W/DBEs in a manner consistent with its plan regarding M/W/DBE participation, and shall comply with [KJM's] stated or negotiated participation

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 9

> goals. . . . In the event that any such M/W/DBEs no longer remain associated with [KJM], . . . [KJM] shall take all reasonable steps to maintain the overall utilization of such businesses at a level consistent with [KJM's] commitments.

(Dkt. #52-8, Ex. 72 at 180). This language makes apparent that the intent of the parties is to maintain a certain level of DBE participation, not to create a contractual right in each named subcontractor to perform a specific job.[6] The contract specifically foresees the possibility of some of the named subcontractors not remaining part of the project. Additionally, if plaintiffs' argument was to succeed, Ms. Thomas would have a contractual right to perform the work of Contract Administration Lead even if she had never entered into any subcontract. Because the parties did not intend that the promisor assume a direct obligation to plaintiffs, the breach of third party beneficiary contract claim fails.

### 3. Breach of Contract: Teaming Agreement

Plaintiffs' claim for breaching the Teaming Agreement also fails and is therefore dismissed. According to plaintiffs, this breach claim "mirrors the third-party beneficiary claim in terms of the promised scope of work as compared to the scope of work assigned." (Dkt. #48 at 20). The purpose of the Agreement was to "produce a proposal which will cause the selection of the 'Prime' as a prime contractor for the 'Project' and the acceptance of C.p.M.e., as the subcontractor for the agreed upon work (Exhibit A)." (Dkt. #52-2, Ex. 4 at 52 (Teaming Agreement, ¶ 1)). Plaintiffs claim that because Exhibit A states the scope of work as "Contract Administration Lead, and M/W/DBE program level support," defendant breached the teaming agreement by "forcing plaintiff to sign the subcontract" which did not include that scope. (*See* Dkt. #48 at 20). Plaintiffs' argument is not persuasive.

The Teaming Agreement is a preliminary agreement, best considered a contract to negotiate. *See Keystone Land & Development Co. v. Xerox Corp.*, 152 Wn.2d 171, 176 (2004). "Under a

---

[6]Moreover, the benefit is directed not toward the named DBEs, but toward Sound Transit who stands to receive federal funding by maintaining a certain percentage of DBEs on the project. (*See* Dkt. #51, ¶ 16).

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 10

1  contract to negotiate, the parties do not intend to be bound if negotiations fail to reach ultimate

2  agreement on the substantive deal." *Id.*  By its own terms, the Agreement acknowledges that the

3  terms of any subsequent subcontract were still to be negotiated.  (*See* Dkt. #52-2, Ex. 4 at 53 ("If a

4  subcontract cannot be negotiated to the satisfaction of both parties within 60 days of the initiation of

5  negotiation, it will be deemed that the parties were unable to reach agreement.")).  That the

6  subcontract contained a different scope of work than envisioned by the Teaming Agreement is not a

7  breach, but a manifestation of subsequent negotiations.  Moreover, there is no evidence that plaintiffs

8  were "forced" to sign the subcontract.  Plaintiffs rely on being presented with the subcontract on a

9  "take-it-or-leave-it" basis as evidence of being forced to sign.  (*See* Dkt. #1 (Compl., ¶ 20)).

10 However, the record shows that the scope was amended to include Team Diversity Manager.  (Dkt.

11 #51, ¶ 7).

12       Plaintiff Thomas also claims to have signed the contract based on representations by Ms. Mask

13 that "administrative amendments and change orders would be provided that would allocate distinct

14 and meaningful work to CpMe."  (Dkt. #51, ¶ 8).  Not only does this fall short of being "forced" to

15 sign, but, as mentioned above, plaintiffs have withdrawn their claims based on misrepresentation.

16 Plaintiffs have alleged no facts to show the Teaming Agreement was breached and therefore, the claim

17 is dismissed.

18              4.  Breach of Contract: Subcontract

19       Plaintiffs' claim for breach of the Subcontract relies on incorporation of the Developmental

20 Opportunity Plan into the Subcontract as Attachment E.  (Dkt. #48 at 19).  Specifically, the Plan

21 identifies as a goal for CpMe to "[e]xpand its staff to 3 employees by the end of 1998."  (Dkt. #52-3,

22 Ex. 5 at 88).  The Court agrees with defendant that the "Specific Goal" column of the Plan outlines

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 11

aspirational goals and not enforceable promises.[7] Each goal corresponds to an action to be taken by KJM listed in the "Action Plan" column. While the items listed under the "Action Plan" column may be enforceable promises, plaintiffs make no allegations that KJM failed to perform the specific actions listed there.

Plaintiffs further allege in their complaint, but do not argue in their brief, that KJM breached the subcontract by not utilizing Ms. Thomas as the "Team Diversity Manager." The record shows that such position was taken away from Ms. Thomas late in 1998. (*See* Dkt. #52-4, Ex. 13, 14). Further, Ms. Thomas states in her deposition that no change order was ever given for that change. (Dkt. #52-4, Ex. 14). Neither party, however, argues this aspect of the breach of contract claim in the briefing. Because the parties do not address it, the Court considers it abandoned.

### 5. Violation of CPA

Plaintiffs' cause of action for violation of the Consumer Protection Act ("CPA") relies on plaintiffs' other claims of discrimination to meet the "unfair or deceptive act" element. Because plaintiffs have failed to establish a *prima facie* case of discrimination, as discussed above, the CPA allegation fails as well.

### III.  CONCLUSION

Having reviewed defendant's motion for summary judgment (Dkt. #29), plaintiffs' opposition (Dkt. #48), defendant's reply (Dkt. #53), the declarations in support of those briefs, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motion for Summary Judgment (Dkt. #29) is GRANTED in its entirety.

(2) Defendant's counterclaims for Breach of Contract/Professional Negligence, Intentional and/or Negligent Misrepresentation, and Frivolous Action remain pending. Defendant shall submit a brief status report stating whether it plans to pursue those claims, <u>no later</u>

---

[7]"A promise is a manifestation of intent to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement 2d of Contracts, § 2.

than 10 days from the date of this Order.

(3) The current trial date and all other related pre-trial deadlines are stricken from the calendar, to be reset if and when it becomes necessary.

(4) The parties' pending motions *in limine* (Dkts. #59 and #60) are stricken from the calendar, to be reset if and when it becomes necessary.

(5) The Clerk shall forward a copy of this Order to all counsel of record.

DATED this 14th day of October, 2005.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
PAGE - 13